UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLAS TRUST COMPANY LLC,<br><br>Plaintiff,<br><br>-against-<br><br>UNIVERSAL ENTERTAINMENT CORP.,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT** |

Plaintiff GLAS Trust Company LLC ("**GLAS**" or "**Plaintiff**") as Collateral Agent and at the direction of certain beneficial owners of notes (the "**Ad Hoc Holders**"), by and through its undersigned counsel, for its Complaint for Declaratory Judgment against Universal Entertainment Corporation ("**UEC**" or "**Defendant**"), alleges as follows:

## NATURE OF THE ACTION

1. This action arises out Defendant's default on its obligations under a Note Purchase Agreement, or NPA (defined below) to the Ad Hoc Holders, who are the beneficial owners of more than 74%[1] in aggregate principal amount of UEC's outstanding Senior Notes (defined below).

2. In 2017, an internal investigation by UEC determined that Mr. Kazuo Okada ("**Mr. Okada**"), the founder and then Chairman of UEC, misappropriated over 2 billion Japanese Yen of company funds for personal use. Thereafter, Mr. Okada was removed from his various management and board positions at UEC, as well as at its subsidiaries, Tiger Resorts Asia Limited ("**TRAL**"), and Tiger, Resort, Leisure and Entertainment, Inc. ("**TRLEI**").

---

[1] Percentage based on aggregate holdings as of October 7, 2022.

3. After Mr. Okada was removed, UEC sought to raise capital by issuing and selling notes worth $600 million (and, after later amendments and issuance of additional notes, now worth $760 million in outstanding principal on the Senior Notes), pursuant to the NPA.

4. The NPA contains protections against the risk that Mr. Okada will return to a management position at UEC or its subsidiaries. Under the NPA, if Mr. Okada nominates anyone to the board of UEC or its subsidiaries, or if Mr. Okada or any person or group of which he is a member is elected to the board of UEC or any of its subsidiaries (including TRLEI), an Ownership Structure Put Option (defined below) is triggered. The Ownership Structure Put Option expressly requires UEC to provide notice of the triggering event within 10 days of its occurrence and offer to repurchase all or part of the Senior Notes at a set price.

5. On April 27, 2022, the Supreme Court of the Philippines entered an order restoring the *status quo ante* prior to Mr. Okada's removal from his positions in April 2017, which had the effect of reinstating Mr. Okada as chairman, CEO, director, and nominal stockholder of TRLEI. Thereafter, on May 2, 2022, Mr. Okada nominated himself and other individuals to the board of directors, and as officers, of TRLEI.

6. Mr. Okada, along with ten of his associates, were thereafter elected to the board of directors in a Special Stockholders Meeting.

7. The SQAO (defined below) and the subsequent nominations and elections, individually and/or collectively triggered the Ownership Structure Put Option under the NPA.

8. UEC failed to notify GLAS or the Ad Hoc Holders within ten days of these events, or to make the required offer to repurchase the Senior Notes as required under the NPA. The Ad Hoc Holders notified UEC on June 23, 2022, that Mr. Okada's reinstatement and subsequent events triggered the Ownership Structure Put Option, and that UEC's failure to provide the

required notice and repurchase offer was an Event of Default as defined in the NPA. Defendant disputes that the Ownership Structure Put Option was triggered and that any default has occurred.

9. GLAS seeks a declaratory judgment that the Ownership Structure Put Option was triggered, that an Event of Default has occurred, and that GLAS and the Ad Hoc Holders are entitled to the remedies afforded to them under the NPA, including requiring UEC to repurchase all or part of the Senior Notes pursuant to the NPA's Special Ownership Put Option.

10. Additionally, GLAS seeks indemnification for all suits, claims, and reasonable costs and expenses incurred by it and the Ad Hoc Holders in connection with all actions taken to protect their interests in the disputes relating to and arising out of the Senior Notes, as required by the NPA's indemnification provision.

**PARTIES**

11. GLAS is a limited liability company organized and existing under the laws of the State of New Hampshire, with its principal place of business at 3 Second Street, Suite 206, Jersey City, NJ 07311. It is the Collateral Agent and Fiscal Agent (and the Registrar, the Transfer Agent, as well as the Paying Agent) with respect to the Senior Notes. GLAS has also received instruction from the Ad Hoc Holders to commence this action for their benefit.

12. On information and belief, Defendant UEC is a company incorporated in Japan with its registered address at Ariake Frontier Building Tower-A, 7-26, Ariake 3-chome, Koto-ku, Tokyo, Japan. Pursuant to the NPA, UEC appointed Aruze USA, Inc., with an address at 2831 St. Rose Parkway, Suite 334, Henderson, Nevada 89052, as UEC's agent for service of process in the United States.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction pursuant to 29 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of New Hampshire, UEC is a citizen of Japan, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. This Court has personal jurisdiction over Defendant pursuant to Section 27.7(a) of the Initial NPA (defined below), in which Defendant consented to the "jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, the City of New York, over any suit, action or proceeding arising out of or relating to this Agreement, the Notes or any other Notes Document."

15. Section 27.7(a) further provides that the Company waives "any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum." *Id.*

16. This case presents an actual controversy pursuant to 28 U.S.C. § 2201 concerning the parties' rights under the NPA.

## FACTUAL ALLEGATIONS

**I. THE REMOVAL OF MR. OKADA FROM UEC AND ITS SUBSIDIARIES**

17. Mr. Okada founded UEC in 1969, and served as its Chairman until 2017. UEC, through its interests in TRAL and TRLEI, indirectly owns, controls, and operates Okada Manila, a resort and casino located in Parañaque, in the greater Manila metropolitan region of the Philippines.

18. In 2017, Mr. Okada was removed from all of his positions with the Defendant and its subsidiaries after UEC's internal auditor uncovered evidence of misappropriation by Mr. Okada

of over 2 billion Japanese Yen from the Defendant and its subsidiaries. This included removal of Mr. Okada from his positions as Chairman of UEC; director and representative of TRAL; and Chairman, CEO, director, and nominal stockholder of TRLEI.

19. On August 29, 2018, Mr. Okada filed a complaint in the Regional Trial Court of Parañaque City, Philippines against TRAL, TRLEI, and TRLEI's directors seeking a declaration that his removal as stockholder, director, chairperson, and CEO of TRLEI was null and void and reinstating him to those positions. Mr. Okada's complaint was dismissed in November 2018. Mr. Okada appealed to the Philippines Court of Appeal in December 2018, and that appeal was denied in September 2020. Mr. Okada then filed a motion for reconsideration in October 2020, which the Philippines Court of Appeal also denied in February 2021. In April 2021, Mr. Okada petitioned the Supreme Court of the Philippines for review on *certiorari*.

II. **PURCHASE OF UEC'S NOTES WAS CONDITIONED UPON PROTECTIONS IN THE EVENT THAT MR. OKADA RETURNED TO MANAGEMENT**

20. In 2018, UEC sought to raise capital through the issuance of up to $600 million in notes due at a redemption price of 107.75%. In connection with this offering, UEC issued an Information Memorandum (the "**IM**") providing details about UEC's offering.

21. The IM disclosed Mr. Okada's actions in the Philippines courts, and acknowledged the risk of "adverse consequences" related to Mr. Okada potentially returning to the management of UEC and its subsidiaries. For example, in the "Risk Factors" section, the IM stated:

> **We may be subject to adverse consequences relating to our former Chairman, Kazuo Okada, who may return to our management as a result of ongoing litigation proceedings**.
>
> In 2017, Kazuo Okada was removed from our Board of Directors, as well as the board of directors of our subsidiaries, after being accused by our current management of three acts of fraudulence outlined in an independently-commissioned investigation and after he was not re-elected as a Director at our shareholders' meeting in June 2017. On August 29, 2018, Kazuo Okada asked the Parañaque

5

> City Regional Trial Court to order his reinstatement to the chairmanship and directorship of Tiger Resort, the operator of Okada Manila. Kazuo Okada also asked the court to declare his ouster from the Tiger Resort in June last year void for "being without authority" and for violating the Philippine Corporation Code. Also named as defendants in Kazuo Okada's complaint were TRAL, Tiger Resort directors Manuel Lazaro, Kenji Sugiyama, Steven Wolstenholme, Antonio Cojuangco, Reynaldo David, and Yoshinao Negishi, and TRAL directors Kenshi Asano and Takako Okada. . . .
>
> The negative publicity relating to Kazuo Okada's alleged fraudulent activities, as well as the ongoing dispute with Kazuo Okada, may have an adverse impact on our reputation, and, in turn, our business, financial condition and results of operations. Furthermore, *in the event that Kazuo Okada returns to a management position at our Company as a result of ongoing litigation proceedings, we may experience unforeseen consequences on the stability of our management and the financial performance of our Company, TRAL and their respective subsidiaries (collectively, our "Group"), including the frustration of our corporate actions, which may have negative implications on any future development of Okada Manila or affect our ability to operate in certain jurisdictions including the United States*. While we do not believe that the ongoing issues with Kazuo Okada risk the ongoing validity of the Provisional License from PAGCOR or jeopardize our relationship with them, any impact on the Provisional License, including any impact on our ability to obtain our future regular casino gaming license to replace the Provisional License, may have a material adverse effect on our business, condition, results of operation and prospects.

(emphasis added).

22. To address these risks, the IM and the Senior Notes offered an "Ownership Structure Put Option," which would require UEC to offer to repurchase the notes at a set price if Mr. Okada or an individual nominated by him returned to the Board of Directors of UEC or any of its subsidiaries.

23. On December 6, 2018, UEC executed a Note Purchase Agreement (the "**Initial NPA**"), pursuant to which UEC issued and sold notes in the original principal amount of $600

6

million, due on December 11, 2021 (the "**Initial Notes**").  The parties to the Initial NPA are UEC, GLAS as the Collateral and Fiscal Agent, and the beneficial owners.

24. The Initial NPA was amended on October 11, 2019 (the "**First Amendment NPA**"); amended again on October 23, 2020 (the "**Second Amendment NPA**"); and supplemented by way of Supplemental Note Purchase Agreements dated October 23, 2020 (the "**First Supplemental NPA**") and June 25, 2021 (the "**Second Supplemental NPA**").  The Initial NPA, the First Amendment NPA, the Second Amendment NPA, the First Supplemental NPA, and the Second Supplemental NPA are referred to collectively herein as the "**NPA**."

25. Pursuant to the Second Supplemental NPA and Second Amendment NPA, the current outstanding principal amount of the notes is $760 million, due on December 11, 2024 (the "**Senior Notes**").

26. The Ad Hoc Holders are the beneficial owners of Senior Notes representing at least 74% in aggregate principal amount of the outstanding Senior Notes.

27. As contemplated by the IM, the NPA contains protections against the risk of Mr. Okada's return to a position of management at UEC and its subsidiaries.  Specifically, Section 2.13(a) of Schedule 5.1(b) to the Second Amendment NPA states:

> If an Ownership Structure Put Option Triggering Event occurs, each holder of the [Senior Notes] will have the right to require [UEC] to repurchase all or any part of such holder's [Senior Notes] pursuant to an Ownership Structure Put Option Offer (as defined below) on the terms set forth herein.

28. The definition of an "Ownership Structure Put Option Triggering Event" is found in Schedule A to the Initial NPA, and is applicable to Senior Notes:

> "**Ownership Structure Put Option Triggering Event**" means (1) the first day after the Original Issue Date on which an individual or individuals is or are nominated for the Board of Directors of [UEC] or a Subsidiary of [UEC] by Mr. Kazuo Okada or any "person" or

"group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, or any successor provision) of which Mr. Kazuo Okada is a member is or are elected to the Board of Directors of [UEC] or any of its Subsidiaries; or (2) the ABC GK Mechanism becomes operative to effect restrictions on a Person from involvement in the operations of ABC GK's business, which, for the avoidance of doubt, does not include the establishment of the ABC GK Mechanism itself.

29. Section 2.13(b) of Schedule 5.1(b) to the Second Amended NPA requires "[w]ithin ten days following the occurrence of an Ownership Structure Put Option Triggering Event, [UEC] shall mail a notice (an '**Ownership Structure Put Option Offer**') to each holder of the [Senior Notes] with a copy to the Fiscal Agent and the Payment Agent," stating, *inter alia*, "that an Ownership Structure Put Option Triggering Event has occurred and that such holder has the right to require [UEC] to repurchase such holder's [Senior Notes] at a repurchase price in cash equal to 105.50%[2] of the principal amount thereof, plus accrued and unpaid interest, if any, and Additional Amounts, if any . . . ." and "the repurchase date (which shall be no earlier than 10 days nor later than 60 days from the date such notice is mailed." In Sections 10.13(a) and 10.13(b) thereof, the Initial NPA contained the same definition of Ownership Structure Put Option Triggering Event and directed UEC to take the same action upon such an event.

30. In summary, after an Ownership Structure Put Option Triggering Event occurs, UEC ***must***, within ten days, provide notice of such event and allow for the repurchase by UEC of all or any part of the Senior Notes. The NPA does not provide a cure provision for an Ownership Structure Put Option Triggering Event.

31. UEC has failed to provide the Ownership Structure Put Option Offer as required by Section 2.13(b) of Schedule 5.1(b) to the Second Amendment NPA. Pursuant to Section 7(c) of

---

[2] The repurchase price of 105.5% was an increase from the initial repurchase price of 103% in the Initial NPA.

Schedule 5.1(b) to the Second Amendment NPA, such failure constitutes an Event of Default under the NPA. Accordingly, an Event of Default exists and is continuing under the NPA. In addition, failure to comply with the requirements of Section 2.13(b) of Schedule 5.1(b) to the Second Amendment NPA also causes an Event of Default under Section 7(b) of Schedule 5.1(b) to the Second Amendment NPA.

32. The NPA also includes an indemnity provision. Section 19.1(a) of the Initial NPA states:

> (a) . . . [UEC] agrees to, and shall, pay and indemnify and save each Agent and each Purchaser and their respective Affiliates and the owners, officers, directors, trustees, partners, employees, representatives and agents of each Agent, and Purchaser and their respective Affiliates (all of the foregoing being, collectively, "Indemnitees") harmless against liability for: . . .
>
> (d) any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, reasonable costs and expenses or disbursements of any kind whatsoever that may at any time be imposed on, incurred by, or asserted against any such Indemnitee (including the defense of any Indemnitee against any claim asserted by the Company, the Subsidiary Guarantors or any other Person), in any manner relating to or arising out of any of the Notes Documents,[3] the use of proceeds of the Notes, any transaction contemplated hereby or thereby or any other matter related thereto or in connection therewith

33. The Ad Hoc Holders are also "Purchasers" as that term is defined in the NPA.

34. The NPA is governed by New York law. Section 27.6 of the Initial NPA contains a New York choice-of-law clause providing, "[t]his Agreement and any claim or controversy arising hereunder or related hereto shall be construed and enforced in accordance with, and the

---

[3] "'Notes Documents' means, collectively, this Agreement, any Supplemental Note Purchase Agreement, the Notes, the Fiscal Agency Agreement, the Security Documents and the Placement Agency Agreement, and any additional documents designated as 'Notes Document' by the Company from time to time." Initial NPA, Schedule A at A-18; *see also* Second Amendment NPA, Schedule 5.1(b).

9

rights of the parties shall be governed by, the laws of the State of New York, excluding choice of law principles of the law of such state that would permit the application of the laws of a jurisdiction other than the laws of such state." Section 3 of the Second Amendment NPA states, "[t]his Amendment and any claim or controversy arising hereunder or related hereto shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York."

35. The NPA also provides that UEC consents to the jurisdiction of New York State and federal courts. Pursuant to Section 27.7(a) of the Initial NPA, which remains applicable, UEC:

> [I]rrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement, the Notes or any other Notes Document. To the fullest extent permitted by applicable law, [UEC] irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding, brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

36. In connection with the NPA, on December 11, 2018, UEC executed a Fiscal Agency Agreement with GLAS, which appointed GLAS the Fiscal Agent, Registrar, Transfer Agent, and Paying Agent with respect to the Notes. The Fiscal Agency Agreement is also governed by New York law.

37. Also on December 11, 2018, UEC and certain of its subsidiaries, including TRAL and TRLEI, entered into a Guarantee and Collateral Agreement, which, among other things: (i) made GLAS the Collateral Agent for purchasers of the Initial Notes and other secured parties pursuant to the terms of the Initial NPA; and (ii) made TRAL and TRLEI guarantors who agreed

10

to guarantee, jointly and severally, unconditionally and irrevocably, the prompt and complete payment and performance of UEC under the Initial NPA.

### III. PHILIPPINES SUPREME COURT ORDER REINSTATING MR. OKADA

38. On April 27, 2022, the Supreme Court of the Philippines entered a *Status Quo Ante Order* ("**SQAO**"), which ordered the respondents in that case (including TRAL and TRLEI) to "**MAINTAIN THE STATUS QUO** prevailing prior to [Mr. Okada's] removal as stockholder, director, chairman, and CEO of [TRLEI] in 2017." (emphasis in original). This had the effect of reinstating Mr. Okada as chairman, CEO, director, and nominal stockholder of TRLEI effective immediately.

39. On May 2, 2022, Mr. Okada called a Special Stockholders' Meeting of TRLEI to hold board elections. At that meeting, Mr. Okada was reelected to TRLEI's board of directors, along with ten of his selected associates: Antonio Cojuangco, Manuel Lazaro, Steven Wolstenhome, Yoshinao Negishi, Kengo Takeda, Takahiro Usui, Dindo Espeleta, Maximo Modesto Joel C. Flores, Tetsuya Yokota, and Hiroshi Kawamura. Among the individuals nominated by Mr. Okada and elected to TRLEI's board of directors were six former directors who were on TRLEI's board of directors with Mr. Okada in 2017 immediately prior to his removal. Mr. Negishi, Mr. Takeda, and Mr. Usui were removed from their positions alongside with Mr. Okada in 2017 following UEC's discovery of Mr. Okada's wrongdoing.

40. Immediately after the Special Stockholders' Meeting, the new board elected Mr. Okada as Chairman of TRLEI, and elected his selected associates as its officers.

41. On May 24, 2022, the Philippines Amusement and Gaming Corporation ("**PAGCOR**")—the Philippine's regulating entity responsible with oversight of its gaming industry—issued a letter recognizing the election of Mr. Okada and his associates to TRLEI's board of directors.

42. On May 31, 2022, the newly elected board took over operations of the Okada Manila and TRLEI's corporate offices.

## IV. DEFENDANT'S REFUSAL TO HONOR ITS OBLIGATIONS UNDER THE NPA AND ITS FAILURE TO OFFER THE OWNERSHIP STRUCTURE PUT OPTION

43. UEC did not notify GLAS or the Ad Hoc Holders of an Ownership Structure Put Option Triggering Event within ten days after the Philippines Supreme Court issued the SQAO that resulted in Mr. Okada being reinstated s stockholder, director, chairman and CEO of TRLEI—one of UEC's subsidiaries.

44. UEC also did not provide the required notice of an Ownership Structure Put Option Triggering Event within 10 days after Mr. Okada and his selected associates were nominated and reelected to TRLEI's board of directors or even after that election was recognized by PAGCOR. Nor did they provide notice when Mr. Okada took over operations of the casino.

45. On June 23, 2022, counsel for the Ad Hoc Holders sent a letter to the Defendant and TRLEI, notifying them that the SQAO and the subsequent board nominations and elections were Ownership Structure Put Option Triggering Events, and UEC's failure to provide the Ownership Structure Put Option Offer within 10 days resulted in an event of default under the NPA.

46. Defendant's counsel responded to the Notice of Default on July 1, 2022, disputing that any event of default has occurred.

47. Although the parties attempted to resolve these issues amicably, UEC cut short any discussions and resorted to litigation. But, rather than bringing an action in New York—which law governs the NPA—to determine the party's rights under the NPA and whether an event of default occurred, on August 8, 2022, Defendant filed an *ex parte* application for an injunctive order against GLAS in the High Court of the Hong Kong Special Administrative Region, Court of the

First Instance (the "**Hong Kong Court**"). Defendant sought an order restraining GLAS (and the Ad Hoc Holders) from enforcing any part of the security created by Share Charge agreements between (i) UEC and GLAS, and (ii) TRAL and GLAS, whether on its own or on instructions from the Ad Hoc Holders, on the basis that there has been an Ownership Structure Put Option Triggering Event and/or Event of Default under the NPA.

48. Even though the NPA is governed by New York law, Defendant also issued a Concurrent Originating Summons seeking a declaration that: (1) "No Ownership Structure Put Option Triggering Event as defined under the NPA Documents or the Security Documents . . . has occurred"; (2) UEC "is not obliged to make or issue the Ownership Structure Put Option Offer (as defined under the NPA Documents or the Security Documents) and/or repurchase the Notes . . . from the Ad Hoc Holders (or any other Secured Parties) per the NPA Documents"; and (3) "No Event of Default under any of the NPA Documents or the Security Documents has occurred as a result of [UEC] not making an Ownership Structure Put Option Offer . . . ."

49. The Hong Kong Court issued the injunctive order *ex parte* on August 8, 2022 and held a hearing on August 11, 2022. The Hong Kong Court does not have jurisdiction over the Ad Hoc Holders so that matter is proceeding as GLAS as respondent, taking direction from the Ad Hoc Holders. At the hearing, the Hong Kong Court ordered that the injunctive order would be extended and remain in effect until final disposition of the case. .

50. Because New York law governs the issues of whether the events described above triggered the Put Option, and ultimately resulted in an Event of Default, and because Defendant voluntarily submitted to the jurisdiction of New York courts to resolve disputes under the NPA, this Court is the appropriate forum to determine the parties' rights under the NPA.

13

## V. THE PHILIPPINES SQAO

51. On August 10, 2022, the Supreme Court of the Philippines issued a resolution clarifying its SQAO (the "**Resolution**").

52. The Resolution provided that the SQAO was "properly issued in accordance with law and jurisprudence," and had the effect of restoring the parties "to the last, actual, peaceable and uncontested state of things that preceded the controversy"—namely, "the time when **Kazuo [Okada] was a stockholder, director, chairperson, and CEO of TRLEI, prior to his sudden removal as such.**" Resolution at 11 (emphasis in original).

53. The Philippines Supreme Court referred the case back to the Court of Appeals to receive evidence regarding factual matters related to maintaining the SQAO and the lower courts' rulings dismissing Mr. Okada's complaint. The Court of Appeals proceeding remains ongoing.

54. Notwithstanding the Philippines Supreme Court's ruling that the Court of Appeals was to take evidence on these matters, on August 23, 2022, TRAL director Kenji Asano wrote a letter to PAGCOR on behalf of TRAL seeking reconsideration of PAGCOR's prior recognition of the board elections held at the Special Stockholders' Meeting called by Mr. Okada. PAGCOR then submitted a request to the Philippines Department of Justice ("**PDOJ**") seeking guidance on the issue.

55. On September 1, 2022, the PDOJ sent PAGCOR a letter stating the Philippines Status Quo Order required the return of Mr. Okada as stockholder, director, Chairman, and CEO of TRLEI, but ostensibly did not empower him to form a new board or assume the role of TRAL representative. On September 2, 2022, PAGCOR's board of directors adopted a resolution partially withdrawing PAGCOR's recognition of the elections held at the Special Stockholders'

14

Meeting to the extent it elected directors other than Mr. Okada, but reaffirming its recognition of Mr. Okada as stockholder, director, Chairman and CEO of TRLEI.

56. In response to the actions taken by PDOJ and PAGCOR, the Philippines Court of Appeals issued an order on September 7, 2022, which admonished PAGCOR and TRAL for interfering with the case and ordered the entities to "cease and desist from performing any and all acts that interfere with, impede and obstruct the proceedings."

57. Litigation remains ongoing in the Philippines regarding the SQAO and who is in control of TRLEI and the Okada Manila casino.

## FIRST CAUSE OF ACTION

(Declaratory Judgment)

58. Plaintiff repeats and re-alleges each of the allegations assertion in paragraphs 1 through 57 above as though fully set forth herein.

59. Section 2.13(b) of Schedule 5.1(b) to the Second Amended NPA required UEC to mail an Ownership Structure Put Option Offer within 10 days following the occurrence of an Ownership Structure Put Option Triggering Event, notifying GLAS and the Ad Hoc Holders that an event has occurred and that the Ad Hoc Holders had the right to require UEC to repurchase the Senior Notes at a repurchase price in cash equal to 105.5% of the principal amount, plus accrued and unpaid interest, if any, and additional amounts, on a purchase date no later than 60 days from the date the offer is mailed.

60. The NPA defines an Ownership Structure Put Option Triggering Event as, *inter alia*, "the first day after the Original Issue Date on which an individual or individuals is or are nominated for the Board of Directors of [UEC] or a Subsidiary of [UEC] by Mr. Kazuo Okada or any 'person' or 'group' (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act,

or any successor provision) of which Mr. Kazuo Okada is a member is or are elected to the Board of Directors of [UEC] or any of its Subsidiaries."

61. TRLEI is a subsidiary of UEC.

62. The SQAO, which restored Mr. Okada to his position as stockholder, director, Chairman, and CEO of TRLEI as of April 27, 2022, is an Ownership Structure Put Option Triggering Event.

63. The reelection of Mr. Okada as a director of TRLEI, which occurred during the Special Stockholders' Meeting, is also an Ownership Structure Put Option Triggering Event.

64. The nomination by Mr. Okada of Antonio Cojuangco, Manuel Lazaro, Steven Wolstenhome, Yoshinao Negishi, Kengo Takeda, Takahiro Usui, Dindo Espeleta, Maximo Modesto Joel C. Flores, Tetsuya Yokota, and Hiroshi Kawamura is another Ownership Structure Put Option Triggering Event.

65. The election of each of Mr. Okada's ten selected associates as a director of TRLEI during the Special Stockholders' Meeting also each constitutes an additional Ownership Put Option Triggering Event.

66. Mr. Okada's takeover of the Okada Manila casino operations also constitutes an Ownership Put Option Triggering Event. UEC was required to mail an Ownership Structure Put Option Offer to the Ad Hoc Holders within ten days of (i) the Philippines Status Quo Order, (ii) the Special Stockholders' Meeting and/or (iii) Mr. Okada's takeover of TRLEI and the operations of the Okada Manila casino. UEC failed to do so.

67. UEC has failed to provide an Ownership Structure Put Option Offer or otherwise comply with the NPA's Ownership Structure Put Option provisions, even after receiving notice of default from the Ad Hoc Holders.

68. As a result of the foregoing, the Court should declare that the Ownership Structure Put Option was triggered, that UEC failed to provide the requisite notice and opportunity to require repurchase of the Senior Notes, that an Event of Default has occurred, and that GLAS and the Ad Hoc Holders are entitled to exercise their remedies under the NPA.

## SECOND CAUSE OF ACTION

(Indemnification)

69. Pursuant to the NPA, UEC is obligated to indemnify GLAS and the Ad Hoc Holders for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, reasonable costs and expenses or disbursements of any kind incurred by GLAS and the Ad Hoc Holders relating to or arising out of the Senior Notes. *See* NPA at Section 19.1(a)(d).

70. GLAS and the Ad Hoc Holders have incurred costs in defending against the action in the Hong Kong Court and in protecting their rights and interests as a result of UEC's failure to fulfill its obligations under the NPA.

71. As a result of the foregoing, the Court should declare that UEC is obligated to indemnify GLAS and the Ad Hoc Holders for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, reasonable costs and expenses or disbursements of any kind incurred by GLAS and the Ad Hoc Holders relating to or arising out of the Senior Notes, including but not limited to the present action and the action before the Hong Kong Court.

72. **WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment declaring that under the plain language of the NPA: (1) an Event of Default has occurred; (2) that GLAS and the Ad Hoc Holders are entitled to exercise their remedies under the NPA and (3) that UEC is required to indemnify GLAS and the Ad Hoc Holders for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, reasonable costs and expenses or

disbursements of any kind incurred by GLAS and the Ad Hoc Holders relating to or arising out of the Senior Notes, including but not limited to the present action and the action before the Hong Kong Court, and such other and further relief as the Court deems just and proper.

**Dated:** October 20, 2022
New York, NY

                                   Respectfully submitted,

                                   */s/ Theodore E. Tsekerides*

                                   **WEIL, GOTSHAL & MANGES LLP**
                                   Theodore E. Tsekerides
                                   Matt Barr
                                   Sunny Singh
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Telephone: (212) 310-8000
                                   Facsimile: (212) 310-8007
                                   Email: theodore.tsekerides@weil.com

                                   *Counsel for Plaintiff*